## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| JARED LLOYD SHANKLIN, | § | |
| Petitioner, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-08-1111 |
| | § | |
| NATHANIEL QUARTERMAN, | § | |
| Respondent. | § | |

### MEMORANDUM AND OPINION

The petitioner, Jared Lloyd Shanklin, seeks habeas corpus relief under 28 U.S.C. § 2254, challenging a 2003 state felony conviction for murder. The respondent moved for summary judgment, (Docket Entry No. 12), with a copy of the state court record. (Docket Entry No. 11). Shanklin filed a response with the assistance of counsel, (Docket Entry No. 13), and the respondent has filed a reply, (Docket Entry No. 15). Based on careful consideration of the pleadings, the motion and response, the record, and the applicable law, this court grants the respondent's motion and, by separate order, enters final judgment. The reasons are set out below.

### I.    Background

The background is taken from the trial transcript. At trial, the State presented testimony from eyewitnesses to the shooting that was the basis of the indictment, Houston Police Department ("HPD") officers who investigated the shooting, and the medical examiner who performed the autopsy.

Robert Gutierrez, an HPD officer assigned to the Crime Scene Unit of the Homicide Division, testified that on November 19, 2002, he was dispatched to a pool hall in Houston. (Reporter's Record, Vol. III, pp. 15, 17). At the scene, Gutierrez observed the body of a man later identified as Michael Gaddis lying in the parking lot. There were several people in the area.

Gutierrez conducted a thorough search of the scene. (*Id.* at 20). Officer Gutierrez identified photographs and a videotape of the crime scene as well as fired cartridge casings and a pistol recovered from the scene. (*Id.* at 30). At the scene, Gutierrez found one fired cartridge casing on the ground and one lodged or "stove piped" in the pistol. (*Id.* at 33). Gutierrez could not determine where the gun was fired based on where he found the fired cartridge. (*Id.* at 38). Gutierrez testified that a firearm such as the one recovered from the scene was a deadly weapon. (*Id.* at 33).

On cross-examination, counsel asked if Officer Gutierrez had recovered a broken beer bottle. (*Id.* at 34). Counsel asked about the distance of the fired cartridge from the body; Gutierrez testified that it was a distance of seventeen feet. (*Id.* at 35).

Troy Herschel Parker testified that he was at the pool hall on November 19, 2002, at approximately 12:00 or 1:00 a.m. (Reporter's Record, Vol. III, pp. 39-40). He testified that at closing time, 2:00 a.m., there was an altercation between two people in the parking lot. (*Id.* at 41). He saw the two, later identified as Gaddis and Shanklin, arguing. (*Id.* at 42). Parker testified that he did not know either Shanklin or Gaddis. He had a good view of both men but could not hear what they were saying. There were a lot of people gathered around the fighting men, but it appeared to Parker to be a "fair fight." (*Id.* at 44). At one point, Gaddis got into a truck in the parking lot. Other people, apparently his friends, tried to get him to stay in the truck, but Gaddis got out and rushed toward Shanklin. (*Id.* at 44). Parker did not see anything in Gaddis's hands. (*Id.* at 45).

Parker saw Gaddis and Shanklin exchange more words and then saw Shanklin shoot Gaddis from a distance of two feet. (*Id.* at 45). Parker did not see either man punch the other right before Shanklin shot Gaddis. (*Id.* at 46). Parker identified State's Exhibit 12 as the chrome pistol Shanklin used to shoot Gaddis. (*Id.* at 47).

The police responded within seconds of the shots being fired. After the shots were fired, Parker saw Shanklin running away from the police. (*Id.* at 47). Parker heard Shanklin say, "He didn't shoot and he didn't do anything." (*Id.* at 48).

On cross-examination, Parker identified one of the men who tried to keep Gaddis in the truck as Oliver McMillan.[1] Parker knew McMillan from school. Defense counsel asked if Parker saw a bottle thrown at Shanklin; whether Parker talked to McMillan after the shooting; where the police were while the men were arguing; why Parker believed that McMillan was trying to keep Gaddis in the truck; and how the lighting was in the parking lot.

Another eyewitness, Richard Carter, testified that he was working as a private security guard on November 19, 2002 at the pool hall. (Reporter's Record, Vol. III, p. 61). Carter explained that his duties included checking for weapons, controlling the crowd inside the club, and clearing the club and parking lot at the end of the evening. (*Id.* at 64). Carter testified that there were five to six police officers and two security officers working at the club that night.

Carter saw a group of six men arguing in the parking lot. He did not see a gun, bat, bottle, or other weapon. He broke up the fight. At that point, nothing prevented those involved from leaving. (*Id.* at 66). As Carter went to get another police officer to help, he heard shots and turned toward them. As he turned, he saw Gaddis falling and Shanklin running with a gun in his right hand. (*Id.* at 67-68). Carter was fifteen or twenty yards away. He drew his gun and told Shanklin to stop and put the gun down. (*Id.* at 69-70). Shanklin ran between two cars, crouched, then stood up with his hands in the air. (*Id.* at 70). While Shanklin was standing between the cars, he gave the gun to

---

[1]The transcript also refers to this witness as "McMillion."

a friend.  (*Id.* at 71).  Carter saw the gun on the ground near the cars.  (*Id.* at 72).  He identified State's Exhibit 12 as that gun.

Michael Lyons testified that he worked for the City of Houston in the HPD Forensic Firearms Laboratory.  (Reporter's Record, Vol. III, p. 80).  Based on a test fire, he determined that the bullets recovered from Gaddis's body were fired from the gun recovered from the scene, State's Exhibit 12.  (*Id.* at 87, 89).

Gabino Garcia testified that he was working as a security guard at the pool hall on November 19, 2002.  (Reporter's Record, Vol. III, p. 91).  Garcia first saw Gaddis at about 2:10 a.m., after the club had closed.  Garcia saw Gaddis having a verbal altercation with Shanklin.  (*Id.* at 94).  There were about seven people in the argument.  (*Id.* at 100).  He did not see five men beating up on one man.  (*Id.* at 101).  Garcia was forty-five to fifty yards away but could hear the yelling.  Garcia testified that after Carter broke up the argument, someone threw a bottle.  Garcia testified that it did not hit Shanklin.  (*Id.* at 96).

Gaddis was still with his friends in the parking lot.  Shanklin went to a car and retrieved a bag.  Shanklin's friend tried to pull the bag away, but Shanklin pulled out a gun, walked quickly toward the group, and started shooting.  (*Id.* at 97-98).  Shanklin shot at people, not in the air.  Before the shooting, Garcia did not see anyone physically fighting.  He did not see any weapons other than Shanklin's gun.  (*Id.* at 99).  Garcia did not know either Gaddis or Shanklin.  On cross-examination, defense counsel asked Garcia about his distance from the altercation; his ability to view the scene; whether he ever saw the black bag from which the gun was extracted; why he could not see who threw the bottle; and whether he saw an altercation between  Shanklin's group and Gaddis's group.

4

Joe Henry, an HPD lieutenant, testified that he was working an extra job at the pool hall. (Reporter's Record, Vol. III, p. 112). At closing time, he and other uniformed HPD officers worked to clear out the club and then the parking lot. He heard shots and heard a security guard say that there was a fight. Henry went to the scene and a security guard pointed to Shanklin and said that he had the gun. Henry saw Shanklin bend over as if placing something under a car.

Dr. Dwayne Wolf, the Deputy Chief Medical Examiner for Harris County, testified that he performed the autopsy on Gaddis's body. (Reporter's Record, Vol. III, p. 125). There were two gunshot wounds. One wound, on the right side of the face above the ear canal, was from a bullet that had traveled upward and to the left. (*Id.* at 128-30). The second gunshot wound was on the left side of the abdomen and was from a bullet that had traveled front to back and slightly downward, as well as slightly right to left. (*Id.* at 130-31). Gaddis had an abrasion on the left side of the forehead consistent with collapsing to the ground and hitting his head on the pavement. Dr. Wolf testified that the gunshot wound to the head caused Gaddis's death. (*Id.* at 133). His blood alcohol level was .19. (*Id.* at 134).

Richard Moreno, an HPD homicide investigator, took photographs of Shanklin, his brother, John Shanklin, and a man named Darrell Willis and interviewed them at the police station. (Reporter's Record, Vol. III, pp. 135, 140). Officer Moreno testified that John Shanklin was about six feet tall and weighed about 200 pounds. (*Id.* at 141). Darrell Willis was about six feet three inches and close to 300 pounds. Shanklin, the petitioner, claimed to have been hit on the leg with a beer bottle. Officer Moreno took a photograph. (*Id.* at 143). The leg had a scar from a previous surgery but no cuts or blood. (*Id.* at 145).

Officer Moreno reviewed the witness statements. (*Id.* at 147-48).   Each witness saw Shanklin with a gun shortly after hearing the shots.  No witness aw Gaddis with any weapon. (*Id.* at 148).  No witness stated that the fight was unfair.  From his investigation, Officer Moreno did not find that anyone had used deadly force against Shanklin, his brother, John Shanklin, or Darrell Willis. (*Id.* at 159).  Moreno testified that nothing prevented Shanklin or Willis from retreating. (*Id.* at 160).

On cross-examination, Officer Moreno testified that the appearance of Shanklin's leg was consistent with being hit by a bottle. (*Id.* at 150).  Moreno testified that three hours after the shooting, Shanklin told him that he had shot Gaddis to defend Willis.

Helen Gaddis testified that Gaddis was her biological grandson and that she had adopted him when he was eight years old.  He was twenty-six years old when he died, leaving behind three young children.

The defense presented Shanklin, John Shanklin, and several friends.  The defense first called Tequila Hawkins.  She testified that she met her boyfriend, Oliver McMillan, at the pool hall on November 19, 2002. (*Id.* at 172).  She testified that she used to work with John Shanklin and through him, met Shanklin.  When she first arrived at the club, she hugged both Shanklin and John Shanklin and went to the back to meet her boyfriend. (*Id.* at 173).  Hawkins saw John Shanklin later on and introduced him to her boyfriend.  Gaddis was standing next to Hawkins.  He became very upset when John Shanklin walked away after talking to Hawkins. (*Id.* at 175).  As John Shanklin was walking away, Gaddis approached him from behind and touched him on the shoulder.  John Shanklin turned around.  The two men had a verbal confrontation, but John Shanklin walked away. Gaddis and his friends followed him through the club.  There was another altercation between

Gaddis and John Shanklin near Hawkins's car. McMillan told Hawkins to leave, and she did. (*Id.* at 180).

John Earl Shanklin, II, Shanklin's brother, testified that he drove Shanklin and Willis to the pool hall on November 19, 2002. At the club, John Shanklin spoke with Tequila Hawkins. Gaddis asked John Shanklin why he was talking to Hawkins. John Shanklin did not know Gaddis. (*Id.* at 184). John Shanklin talked to Hawkins in the parking lot as he and Willis were leaving. Gaddis approached John Shanklin and asked why he was still there. They exchanged words. Shanklin walked up and told John Shanklin to let it go. There were eight to ten people in Gaddis's group. They started arguing with Shanklin, John Shanklin, and Willis. Three or four of Gaddis's friends argued with Willis. (*Id.* at 189). One hit Willis on the side of his face. Willis could not walk away because he was surrounded. Gaddis was one of the men surrounding Willis. (*Id.* at 190). Willis had had a stroke and suffered from right-side weakness.

Someone threw a bottle at Shanklin's knee. John Shanklin was walking away when he heard shots. While the three men were at the police station, Shanklin told his brother John that he had shot Gaddis. John Shanklin testified that three men had jumped on Willis, but he did not try to intervene because he feared for his life. On cross-examination, John Shanklin admitted that he did not mention anyone hitting Willis in the statement he gave to the police. (*Id.* at 196-97).

Darrell Jermaine Willis testified that he was Shanklin's neighbor and had known him since he was three years old. (Reporter's Record, Vol. III, p. 204). In April 2000, Willis had two strokes that left him unable to speak and weak on the right side of his body. (*Id.* at 204). Willis testified about going to the pool hall with John Shanklin and Shanklin. Willis saw John Shanklin talk to Hawkins and saw Gaddis become angry. When John Shanklin and Willis started walking away,

Gaddis touched John Shanklin on the shoulder and threw his arms up in the air, indicating that he wanted to fight.  Willis and John Shanklin went to the parking lot.  A friend came up to Willis in the parking lot, asked what had happened in the club, and gave Willis a gun.  (*Id.* at 210).  Shanklin told Willis to give him the gun because Willis was not stable enough to handle it.  Willis saw John Shanklin standing near Hawkins's car.  Shanklin and Willis went to get John Shanklin, who was talking to Gaddis.  Nine of Gaddis's friends approached, and John Shanklin walked away.  Shanklin and Gaddis argued and John Shanklin tried to pull his brother away.  Gaddis then started swinging at Willis and he felt blows to his head.  There were three or four people surrounding him.  (*Id.* at 214).  Willis testified that he could not defend himself against all three men.  (*Id.* at 217).  On cross-examination, Willis admitted that his photograph, taken shortly after the shooting, showed no cuts or bruises.  (*Id.* at 220).

Shanklin testified in his own behalf.  He worked as the CEO and owner of JMS Enterprises, a construction company.  (Reporter's Record, Vol. IV, p. 5).  He testified that he was Willis's life-long friend and that Willis was physically disabled from his strokes.  On November 19, 2002, he went to the pool hall with his brother John and Willis.  While in the club, he met a friend and they discussed business.  Shanklin later saw his brother, who appeared upset. (*Id.* at 8).  Shanklin told his brother to calm down and "let it go."

At closing time, Shanklin left the club.  In the parking lot, he took a pistol away from Willis.  Shanklin saw his brother talking to Hawkins.  Willis walked over and stood near John Shanklin.  Gaddis started talking to John Shanklin and the argument got louder.  Gaddis had five or six friends with him.  Shanklin went over to investigate the commotion.  (*Id.* at 13).  Shanklin talked to McMillan and told him to tell Gaddis to calm down.  The conflict started because John Shanklin

spoke to Hawkins. Shanklin testified that he repeatedly told McMillan to tell Gaddis to "let it go." Gaddis continued to argue. Gaddis's group had surrounded Willis. (*Id.* at 17). Shanklin testified that Willis was physically unable to speak. Shanklin saw Willis try to leave, but he was surrounded. Shanklin knew about Willis's physical limitations and that he could not leave Willis. As Shanklin started walking away, McMillan threw a bottle at him and he fell. As he got up, he saw three men in Gaddis's group hitting Willis. Shanklin thought, "they could have hurt him, they could have hurt him." (*Id.* at 20). Shanklin testified that he shot in that direction, in response to seeing the men hit Willis. He shot because he feared for Willis's life and his own. (*Id.* at 20). Shanklin knew that Willis could not defend himself and could not retreat because he was surrounded. (*Id.* at 21). When asked about the need for deadly force, Shanklin testified, "I knew that I couldn't go over there and physically fight with them. So I felt like that was the only thing I could do is shoot in that direction and scatter everything and just calm it down so I could give him the chance to get away from all of that." (*Id.* at 22). When Shanklin fired the gun, he was fifteen feet away from Willis. Shanklin testified that during the fight, the police were nowhere to be found. After the shooting, Shanklin walked in the other direction because he feared retaliation. He put the gun on the ground and got on the ground himself in response to police instructions. (*Id.* at 23).

As a rebuttal witness, the State called Oliver McMillan. (Reporter's Record, Vol. IV, p. 56). McMillan testified that he, Gaddis, and three other friends drove the truck to the pool hall on November 19, 2002. McMillan got into an argument with Hawkins, his then-girlfriend. Gaddis got out of the truck and mingled with others in the parking lot. Ten minutes later, a friend came to the truck and said that Gaddis was about to fight. McMillan got between Shanklin and Gaddis and told them that they had to leave Hawkins alone. (*Id.* at 58). Shanklin said "okay." McMillan then turned

around, walked away, and heard gun shots. (*Id.* at 59).  He turned to see Shanklin shoot once more.

McMillan saw Shanklin holding a silver-colored gun.

McMillan testified that although Gaddis and Shanklin argued, there was no fight in the parking lot.  (*Id.* at 61).  There were always a lot of police at the pool hall; if a fight had been in progress, McMillan would not have been able to walk in between Gaddis and Shanklin to intervene.

A jury found Shanklin guilty of the felony offense of murder. (Cause Number 441654).  On August 20, 2003, the jury sentenced Shanklin to sixty years in prison.  On direct appeal, the First Court of Appeals of Texas affirmed the conviction but reversed and remanded for a new punishment hearing.  *Shanklin v. State*, 190 S.W.3d 154 (Tex. App. – Houston [1st] 2005).  On June 28, 2006, the Texas Court of Criminal Appeals granted Shanklin's petition for discretionary review ("PDR"), but dismissed it as improvidently granted on January 10, 2007.  *Shanklin v. State*, 211 S.W.3d 315 (Tex. Crim. App. 2007).  On remand, Shanklin was sentenced to a thirty-year prison term.  He did not file an application for state habeas corpus relief.

With counsel's assistance, Shanklin filed this federal petition on April 10, 2008.  He contends that his conviction is void because his trial counsel provided ineffective assistance by failing to request a jury instruction on the lesser included offense of manslaughter.  (Docket Entry No. 1, Petition for Writ of Habeas Corpus, p. 1).  This claim is analyzed in light of the record and the applicable legal standard.

## III.   The Motion for New Trial

On October 30, 2003, the trial court held an evidentiary hearing by affidavit on Shanklin's motion for new trial.  In that motion, Shanklin alleged that his trial counsel had been deficient in failing to request a jury instruction on manslaughter and in failing to interview and present the

testimony of at least twenty available punishment witnesses. (Clerk's Record, Vol. I, pp. 66-78).

Brian Wice, counsel for Shanklin at the motion for new trial hearing, offered an affidavit from trial

counsel, Lee Richardson.

The affidavit stated:

> My name is LEE RICHARDSON. I am an attorney who was retained to represent Jared Shanklin who was charged with murder in cause no. 941654 in the 337th District Court. This affidavit is being given at the request of Brian Wice, Mr. Shanklin's appellate lawyer, in connection with the motion for new trial he is filing in this case. The assertions in this affidavit are based upon my review of my file, a portion of the reporter's record, and my independent recollection of what occurred before and during the trial of this case.

> **Failure to Request a Jury Charge on Manslaughter and Aggravated Assault**

> During the guilt-innocence stage of trial, I elicited from Mr. Shanklin that he felt like the only thing he could do was to "shoot in the direction" of the individuals whom he believed were assaulting Darrell Willis to "scatter everything and just calm it down so [Mr. Shanklin] could give him the chance to get away from all that." Although Mr. Shanklin told me that he never intended to kill anyone when he fired, I did not elicit this critical bit of information from him. My failure to elicit this critical bit of information was not the result of any reasoned trial strategy.

> I did not request jury instructions on manslaughter and aggravated assault. My failure to request jury instructions on either or both of these lesser included offenses was not the result of any reasoned trial strategy.

(Reporter's Record, Vol. Vitello, Ex. B, p. 1).

Shanklin also submitted an affidavit. He testified that he told trial counsel:

> from the very beginning [ ] when I fired in the  direction of the individuals whom I believed were assaulting Darrell Willis, I did not intend to kill anyone but to merely scare them and to get them to scatter. I thought that he was going to ask me what my intent was

> when I testified at trial but I now know that he did not. Had I known that my testimony entitled me to jury charges on the issues of aggravated assault and/or manslaughter, I would have asked Mr. Richardson to make sure that the jury had these options instead of just murder or not guilty.

(Reporter's Record, Vol. Vitello, Ex. A, p. 1).

The State offered the affidavit of Paula Hartman, the prosecutor who tried the case against

Shanklin. (Reporter's Record, Vol. Vitello, p. 6). She stated:

> I was the prosecutor assigned to handle the above styled and numbered cause of action for the State of Texas. I prepared the case for trial, issued of[sic] subpoenas for witnesses, and handled the case through trial. The defendant was found guilty by a jury and assessed 60 years in prison by that same jury. I do not agree with the assertions of the defense lawyer in this case contained in the defense affidavit and I believe that he is not being candid with the court in his admissions to "alleged" ineffective assistance.
>
> Failure to Request a Lesser Jury Charge Instruction
> Contrary to Lee Richardson's assertions in his affidavit that he was neglectful in failing to ask for the lesser of manslaughter or aggravated assault, I believe that it was sound trial strategy on his part not to request the lesser offenses. Lee Richardson did request and receive charges of self-defense and defense of third party. It would have been viewed as contradictory to have asked the jury to find him not guilty and then state that if they find him guilty, they should find him guilty of the lesser offense only. After all, self-defense applies to all defensive theories so that would have been the better request (to the exclusion of the lesser).
> . . .
> Conclusion
> It is my opinion that Jared Shanklin received a fair trial. I believe that Lee Richardson's statements in his affidavit to the court should be viewed with a degree of suspicion. Lee Richardson did represent Jared Shanklin effectively prior to and during trial. Although he may not have done everything possible in the trial, his level of representation was well thought out and did not cause me to have any concerns about the representation of the defendant. Jared Shanklin received effective assistance of counsel from Lee Richardson.

O:\RAO\LHR\2008\08-1111.d03.wpd 8/1/03 11:33 am

12

(Reporter's Record, Vol. Vitello, Attachment 1, pp. 1-2).

The lawyer representing Shanklin at the new trial hearing, Wice, objected to the prosecutor's affidavit as irrelevant.   The trial court overruled the objection.   (*Id.* at 7).   Wice argued that Shanklin's trial counsel, Richardson, had admitted not having a reasoned trial strategy for failing to request a jury instruction on the lesser included offense of manslaughter.   (*Id.* at 8).   The State argued that Richardson's affidavit was not credible and that the trial court, as the fact finder, could choose to disbelieve his testimony. (*Id.* at 16).   The trial court denied Shanklin's motion for new trial without explanation. (*Id.* at 21). (Clerk's Record, p. 144).   This federal habeas petition followed.

## IV.    The Applicable Legal Standards

The federal habeas statutes as amended by the Antiterrorism and Effective Death Penalty Act of 1996, 28 U.S.C. § 2254, apply.   Subsections 2254(d)(1) and (2) of AEDPA set out the standards of review for questions of fact, questions of law, and mixed questions of fact and law that result in an "adjudication on the merits."   An adjudication on the merits "is a term of art that refers to whether a court's disposition of the case is substantive, as opposed to procedural." *Miller v. Johnson,* 200 F.3d 274, 281 (5th Cir. 2000).

The AEDPA provides as follows, in pertinent part:

> (d)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

(e)(1)  In a proceeding instituted by an application for a  writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

A state-court determination of questions of law and mixed questions of law and fact is reviewed under 28 U.S.C. § 2254(d)(1) and receives deference unless it "was contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States." *Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000).  A state-court decision is "contrary to" Supreme Court precedent if: (1) the state court's conclusion is "opposite to that reached by [the Supreme Court] on a question of law" or (2) the "state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent" and arrives at an opposite result. *Williams v. Taylor*, 120 S. Ct. 1495 (2000).  A state court unreasonably applies Supreme Court precedent if: (1) it unreasonably applies the correct legal rule to the facts of a particular case; or (2) it "unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Id.* at 1495.  In deciding whether a state court's application was unreasonable, this court considers whether the application was "objectively unreasonable." *Id.* at 1495; *Penry v. Johnson*, 215 F.3d 504, 508 (5th Cir. 2000).  Questions of fact found by the state court are "presumed to be correct . . . and [receive] deference . . . unless it 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Hill*, 210 F.3d at 485 (quoting 28 U.S.C. § 2254(d)(2)).

Pure questions of fact are governed by § 2254(d)(2). *Martin v. Cain*, 246 F.3d 471, 475 (5th Cir. 2001). In addition, a state court's factual findings are entitled to deference on federal habeas corpus review and are presumed correct under 28 U.S.C. § 2254(e)(1), unless the petitioner rebuts those findings with "clear and convincing evidence." *Garcia v. Quarterman*, 454 F.3d 441, 444 (5th Cir. 2006) (citing *Hughes v. Dretke*, 412 F.3d 582, 589 (5th Cir. 2005) and 28 U.S.C. § 2254(e)(1)). This deference extends not only to express findings of fact, but to the implicit findings of the state court as well. *Garcia*, 454 F.3d at 444-45 (citing *Summers v. Dretke*, 431 F.3d 861, 876 (5th Cir. 2005); *Young v. Dretke*, 356 F.3d 616, 629 (5th Cir. 2004)).

While, "[a]s a general principle, Rule 56 of the Federal Rules of Civil Procedure, relating to summary judgment, applies with equal force in the context of habeas corpus cases," *Clark v. Johnson*, 202 F.3d 760, 764 (5th Cir.), *cert. denied*, 531 U.S. 831 (2000), the rule applies only to the extent that it does not conflict with the habeas rules. Section 2254(e)(1) – which mandates that findings of fact made by a state court are "presumed to be correct" – overrides the ordinary rule that, in a summary judgment proceeding, all disputed facts must be construed in the light most favorable to the nonmoving party. Unless the petitioner can "rebut[ ] the presumption of correctness by clear and convincing evidence" as to the state court's findings of fact, those findings must be accepted as correct. *Smith v. Cockrell*, 311 F.3d 661, 668 (5th Cir. 2002).

## V. The Claim of Ineffective Assistance of Trial Counsel

To establish an ineffective assistance of counsel claim, a petitioner must show that his counsel's performance was deficient and that he was actually prejudiced as a result. *Strickland v. Washington*, 466 U.S. 668, 68 (1984). Whether counsel's performance was deficient is determined by an objective standard of reasonableness. *Kitchens v. Johnson*, 190 F.3d 698, 701 (5th Cir. 1999).

"[S]crutiny of counsel's performance must be highly deferential." *Strickland*, 466 U.S. at 689. "[C]ounsel is strongly presumed to have rendered adequate assistance and to have made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Id.* at 690-91; *see also United States v. Jones*, 287 F.3d 325, 331 (5th Cir.)("Informed strategic decisions of counsel are given a heavy measure of deference and should not be second guessed."), *cert. denied*, 537 U.S. 1018 (2002); *Lockett v. Anderson*, 230 F.3d 695, 714 (5th Cir. 2000) (*Strickland* requires deference to counsel's "informed strategic choices"). "So long as counsel made an adequate investigation, any strategic decisions made as a result of that investigation fall within the wide range of objectively reasonable professional assistance." *Smith v. Cockrell*, 311 F.3d 661, 668 (5th Cir. 2002) (internal quotation marks and citation omitted).

"A conscious and informed decision on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness." *Jones*, 287 F.3d at 331. To overcome the deference given to informed strategic decisions, a petitioner must show that his counsel "blundered through trial, attempted to put on an unsupported defense, abandoned a trial tactic, failed to pursue a reasonable alternative course, or surrendered his client." *Id.*; *see also Moore v. Johnson*, 194 F.3d 586, 615 (5th Cir. 1999) ("*Strickland* does not require deference to those decisions of counsel that, viewed in light of the facts known at the time of the purported decision, do not serve any conceivable strategic purpose.").

Even if a petitioner establishes that his counsel's performance was deficient, he must also establish that "prejudice caused by the deficiency is such that there is a reasonable probability that

the result of the proceedings would have been different." *Ransom v. Johnson*, 126 F.3d 716, 721 (5th Cir. 1997). A petitioner must show that the prejudice made the trial outcome "fundamentally unfair or unreliable." *Id.* (quoting *Lockhart v. Fretwell*, 506 U.S. 364 (1993)).

Under AEDPA, this court must give proper deference to the state court's determination that trial counsel did not render ineffective assistance. *See Ladd v. Cockrell*, 311 F.3d 349, 351 (5th Cir. 2002). Because the state court properly identified *Strickland* as the governing legal principle, the "unreasonable application" prong of section 2254(d)(1) provides the standard that governs this court's review of the state court's decision on Shanklin's ineffective counsel claims. *Bell v. Cone*, 535 U.S. 685, 694-695 (2002). This court must determine whether the state court's application of *Strickland* was objectively unreasonable. *Id.*; *Neal v. Puckett*, 286 F.3d 230, 236 (5th Cir. 2002) (en banc), *cert. denied*, 537 U.S. 1104 (2003). Under section 2254(d)(1), "[w]e have no authority to grant habeas corpus relief simply because we conclude, in our independent judgment, that a state supreme court's application of *Strickland* is erroneous or incorrect." *Catalan v. Cockrell*, 315 F.3d 491, 493 (5th Cir. 2002) (quoting *Neal*, 286 F.3d at 236). "The federal-habeas scheme leaves primary responsibility with the state courts for these judgments, and authorizes federal-court intervention only when a state court decision is objectively unreasonable." *Woodford v. Visciotti*, 537 U.S. 19, 27 (2002).

Shanklin argues that his trial counsel was deficient in failing to request a jury instruction on the lesser included offense of manslaughter. This issue was fully explored at the hearing on Shanklin's motion for new trial. The trial judge denied the motion, without explanation. The issue was raised again on direct appeal. The intermediate appellate court rejected the argument, reasoning as follows:

We analyze appellant's ineffective assistance of counsel issue as a challenge to the denial of his motion for new trial. See Charles v. State, 146 S.W.3d 204, 208 (Tex. Crim. App. 2004) (holding appropriate standard of review for ineffective assistance claim based upon affidavits brought forth in motion for new trial is abuse of discretion). In such circumstances, we review the Strickland test through an abuse of discretion standard. Id. at 208. Thus, we reverse only if the trial court's decision is arbitrary or unreasonable, viewing the evidence in the light most favorable to the ruling.

B. Lesser Included Offenses
1. Manslaughter
In his first sub-point of his first point of error, appellant argues that his defense counsel should have requested an instruction on the lesser included offense of manslaughter and that his failure to do so was ineffective assistance of counsel. He contends that defense counsel's affidavit demonstrates that his decision not to request the lesser offense was not the result of trial strategy.

To establish his claim that defense counsel's performance was deficient for failing to request an instruction on the lesser included offense of manslaughter, appellant must show that he was entitled to the instruction. Fuentes v. State, 991 S.W.2d 267, 272 (Tex. Crim. App. 1999). A defendant is entitled to an instruction on a lesser included offense when the proof for the offense charged includes the proof necessary to establish the lesser included offense, and there is some evidence in the record that would permit a jury rationally to find that if the defendant is guilty, he is guilty only of the lesser included offense. Bignall v. State, 887 S.W.2d 21, 23 (Tex. Crim. App. 1994) (citing Rousseau v. State, 855 S.W.2d 666, 672-73 (Tex. Crim. App. 1993)). Anything more than a scintilla of evidence is sufficient to entitle a defendant to a lesser charge. Bignall, 887 S.W.2d at 23.

A conviction for manslaughter requires a finding that the defendant recklessly caused the decedent's death. Tex. Pen. Code Ann. § 19.04 (Vernon 2003). "A person acts recklessly, or is reckless, with respect to ... the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that ... the result will occur." Tex. Pen. Code Ann. § 6.03(c) (Vernon 2003). A manslaughter charge is required if there is any evidence from which a jury could conclude the defendant did not intentionally or knowingly kill an individual, but consciously disregarded a substantial and unjustifiable risk that the result would occur. Lugo v.

State, 667 S.W.2d 144, 147 (Tex. Crim. App. 1984). "[A] defendant may be shown to be guilty only of the lesser offense if the evidence presented is subject to different interpretations." Saunders v. State, 840 S.W.2d 390, 392 (Tex. Crim. App. 1992). Moreover, it is immaterial whether the evidence fits within the larger theme of the defendant's testimony, whether it was admitted by the State or the defense, and whether it is "strong or weak, unimpeached or contradicted." Jones v. State, 984 S.W.2d 254, 257 (Tex. Crim. App. 1998).

Neither of the parties disputes that manslaughter is a lesser included offense of murder. See Schroeder v. State, 123 S.W.3d 398, 400 (Tex. Crim. App. 2003). We thus determine if there is some evidence in the record that would permit a jury rationally to find that if the defendant is guilty, he is guilty only of the lesser included offense of manslaughter. See Bignall, 887 S.W.2d at 23.

In Hernandez v. State, appellant testified that although he shot and killed the deceased, he did not intend to hit the deceased, but rather tried to scare him away. 742 S.W.2d 841, 842-43 (Tex. App.-Corpus Christi 1987, no pet.). The court of appeals held that this evidence was sufficient to warrant an instruction on manslaughter. Id. at 843.

The facts here are similar to those in Hernandez. Appellant testified that while a group of men were hitting his friend, he shot in the group's direction. He also stated, "I knew that I couldn't go over there and physically fight with him. So I felt like that was the only thing I could do is shoot in that direction and scatter everything and just calm it down so I could give him the chance to get away from all of that." Appellant further stated that he shot while he was getting up from the ground and that he was not sure whether he shot high or low. He also admitted that he could have shot his friend because he was not sure of where he was aiming. Appellant was asked, "you weren't shooting at anybody, were you?" To which appellant responded, "No." He agreed that he was just shooting into the crowd blindly. After he shot, appellant did not realize that he had shot anyone.

In light of the testimony presented, we hold that there is some evidence that appellant acted recklessly and that the jury could have rationally found that appellant, if guilty, was guilty only of manslaughter. See Hernandez, 742 S.W.2d at 843. Construed in the light most favorable to appellant, the evidence presented shows that appellant did not intend to kill the complainant, but rather to scatter

the group of men who were hitting his friend. Accordingly, we conclude that appellant was entitled to an instruction on the lesser included offense of manslaughter.

In addition to showing that he was entitled to the lesser included offense, however, appellant must show that his defense counsel's conduct was deficient, i.e., that it fell below an objective standard of reasonableness under prevailing professional norms. Strickland, 466 U.S. at 688-92, 104 S. Ct. at 2064-67. We presume counsel's actions and decisions were reasonably professional and motivated by sound trial strategy. Jackson, 877 S.W.2d at 771.

At the motion for new trial hearing, appellant's defense counsel submitted an affidavit that stated that his failure to request the lesser included offense of manslaughter was not the result of any reasoned trial strategy. We have recently held that such an affidavit from defense counsel defeats the presumption that defense counsel was employing a reasonable trial strategy. See Biagas v. State, 177 S.W.3d 161, 170-71 (Tex. App.-Houston [1st Dist.] 2005, pet. ref'd). Although defense counsel's affidavit rebuts the presumption that defense counsel had a reasonable strategy in choosing his course of action, appellant must still show that his defense counsel rendered a deficient performance. See Strickland, 466 U.S. at 688-92, 104 S. Ct. at 2064-67.

We cannot conclude that defense counsel acted deficiently in failing to request the lesser included offense of manslaughter. Although defense counsel stated that his failure to request this lesser included offense was not the result of trial strategy, his affidavit provides no explanation regarding why he chose not to ask for the lesser offense and no live testimony was presented on this issue. We assume a strategic motive if any can be imagined; and we find counsel's performance deficient only if the conduct was so outrageous that no competent attorney would have engaged in it. See Bone v. State, 77 S.W.3d 828, 833-34 n. 13 (Tex. Crim. App. 2002).

As the State points out, appellant's defense counsel may have decided not to ask for the lesser included offense because he did not want the jury to consider inconsistent defenses FN1-defense of a third person and manslaughter-each of which requires a different mens rea. Self-defense and defense of a third person require an intentional or knowing intent; manslaughter requires reckless intent. See Tex. Pen. Code Ann. §§ 9.31, 9.33, 19.04 (Vernon 2003). Here, the evidence

raised the issues of self-defense and defense of a third person, and the jury received instructions on these defenses.  By not asking for an instruction on the lesser included offense of manslaughter, the jury could convict appellant of murder, find that he acted in self-defense of himself or of a third party and acquit, or find him not guilty and acquit.  This strategy is known as pursuing an all-or-nothing strategy. See Lynn v. State, 860 S.W.2d 599, 603 (Tex. App.-Corpus Christi 1993, pet. ref'd).  Defense counsel does not act deficiently in failing to request a lesser included offense if he was pursuing an all-or-nothing trial strategy.  See Ex Parte White, 160 S.W.3d 46, 55 (Tex. Crim. App. 2004); Lynn, 860 S.W.2d at 603 (requiring a jury to opt between murder and acquittal, although risky, is sometimes successful).  We therefore conclude that defense counsel's decision not to request the lesser included offense of manslaughter was not so outrageous that no competent attorney would have engaged in it. See Bone, 77 S.W.3d at 833-34 n.13.

FN1. It is permissible for the accused to have the jury decide between inconsistent defensive theories, even when they might directly contradict one another.  Warren v. State, 565 S.W.2d 931, 933 (Tex. Crim. App. 1978).  Nevertheless, it may not be sound strategy to present inconsistent defenses.

We also observe that there were good reasons for defense counsel to pursue an all-or-nothing strategy in this case, the most important of these is that the facts were more consistent with an intentional killing in defense of self and others.  The record shows that the complainant was shot twice at close range; one bullet entered his head traveling slightly upward, and one bullet entered his abdomen traveling slightly downward.  Thus, the shooting itself was more consistent with appellant intentionally shooting the complainant, rather than shooting blindly toward a crowd.  Appellant told his brother, John, at the station shortly after the offense that he had shot the complainant in self-defense.  Appellant told Officer Moreno that he felt he was defending Darrell Willis, a very sympathetic victim because of his disability.  Thus, the record supports defense counsel's not having requested a lesser instruction for manslaughter.

Moreover, the trial court has "discretion to discount factual assertions in an affidavit by an interested party."  Charles, 146 S.W.3d at 210. The trial judge may view defense counsel's affidavit with skepticism because it was not supported by any offer of live testimony, subject to cross-examination. See id. at 213.  As an appellate court, we must

defer to the trial court's ruling to the extent that any reasonable view of the record evidence supports the ruling. Id. at 212. Here, because the trial court could disbelieve defense counsel's affidavit, by finding that defense counsel was employing a reasoned trial strategy, we conclude that the trial court did not abuse its discretion in denying appellant's motion for new trial.

We overrule appellant's first sub-point of his first point of error.

*Shanklin v. State*, 190 S.W.3d 154, 158-61 (Tex. App. – Houston [1st] 2005).

The Texas Court of Criminal Appeals refused Shanklin's petition for discretionary review, which raised the same issues. Such findings of fact and credibility determinations are presumed to be correct. *Summers v. Dretke,* 431 F.3d 861, 871-72 (5th Cir. 2005)(citing § 2254(e)(1)).

Shanklin relies on *Biagas v. Valentine*, 265 Fed. Appx. 166, 2008 WL 341583 (5th Cir. 2008), an unpublished opinion, to support his argument that the state court erred in rejecting the ineffective assistance claim. In *Biagas,* the federal habeas petitioner claimed that his state court trial counsel's failure to challenge a biased member of the venire during jury selection denied him effective assistance. In moving for a new trial in the state court, trial counsel submitted an affidavit admitting that his failure to challenge the prospective juror was not a tactical decision but an oversight. The state trial court denied the motion. The Texas appellate court held that because the trial court could have disbelieved trial counsel's affidavit, there was no basis to find counsel's performance deficient. The federal habeas court denied relief. On appeal, the Fifth Circuit stated as follows:

> Here, the juror in question . . . stated during voir dire that he was biased . . . . Specifically, [the juror] stated that he was "going to be partial" and that he would believe the testimony of a law enforcement officer over that offered by [the defendant]. Despite this admission, [defense counsel] . . . failed to challenge [the juror] for cause or use a peremptory challenge to keep him off of the jury. Rather than

attempt to justify his failure to challenge [the juror] . . . [defense counsel] admitted in his affidavit that his actions were the result of an oversight and not the product of strategic decisionmaking; an admission that was contrary to his own interests and was not contradicted by the State. Moreover, the record supports [defense counsel's contention that his failure to challenge [the juror] was a mistake of omission rather than a calculated choice. As soon as the jurors were announced, [defense counsel] objected to the trial judge and moved for a mistrial.  We have recognized the distinction between strategic judgment calls and plain omissions, see Loyd v. Whitley, 977 F.2d 149, 158 (5th Cir. 1992), and we have emphasized that we are "not required to condone unreasonable decisions parading under the umbrella of strategy, or to fabricate tactical decisions on behalf of counsel when it appears on the face of the record that counsel made no strategic decision at all." Moore v. Johnson, 194 F.3d 586, 604 (5th Cir. 1999).

Accordingly, we conclude that the state appellate court's speculation that the trial court could have concluded that [defense counsel] made a tactical decision not to challenge [the juror] is not supported-and, in fact, is contradicted-by the record. Therefore, in accordance with our precedent . . . as well as with counsel's own admission, we conclude that [counsel's] performance was deficient and hold that the state court decision to the contrary was unreasonable.

*Biagas v. Valentine*, 265 Fed. Appx. at 171-72.

Shanklin argues that the Fifth Circuit's reasoning and analysis in *Biagas* supports his argument that the state court's decision was an unreasonable application of the performance prong of *Strickland.* (Docket Entry No. 1, Petition for a Writ of Habeas Corpus, p. 13).  The respondent points out that Shanklin's counsel on direct appeal and in this habeas petition is the same lawyer who represented the *Biagas* petitioner in his federal habeas proceeding.  The respondent points out that Shanklin, the petitioner, submitted an affidavit in support of his motion for new trial.  That affidavit appears to be a copy of the petitioner's affidavit submitted in *Biagas,* with handwritten alterations. (Docket Entry No. 12, Respondent's Motion for Summary Judgment, p. 15 n.1; Clerk's Record, Vol.

I, p. 81). Shanklin's affidavit had the name of the trial counsel in *Biagas*, Valentine, crossed out, and the name "Richardson" written over it. The respondent also argues that the record shows that Richardson's affidavit was prepared by Wice, not Richardson. Because Richardson's affidavit offers no explanation as to his overall trial strategy, the respondent argues that "the affidavit is nothing but a litany of *mea culpas* offered without discussion, apparently designed to do no more than "set up" Shanklin's ineffective assistance claim. (Docket Entry No. 12, Respondent's Motion for Summary Judgment, p. 15).

Shanklin's reliance on *Biagas* is misplaced. In *Biagas*, the State did not contradict the defense counsel's admission in his affidavit that his actions were the result of an oversight and not the product of strategic decisionmaking. In the present case, by contrast, the State vigorously disputed defense counsel's statements in his affidavit. The State presented a strong argument that the record showed a valid strategic reason for the defense counsel's approach in not asking for a lesser-included-offense instruction. The State offered a controverting affidavit from the prosecutor who tried the criminal case. In her affidavit, the prosecutor explained that she found Richardson's affidavit incredible because it was sound trial strategy for him not to request a jury instruction on the lesser offenses. (Reporter's Record, Vol. VII, Attachment 1, p. 1). In *Biagas*, the Fifth Circuit emphasized that the record revealed no reasonable strategy that would justify the defense lawyer's failure in that case to challenge a juror for bias. The court emphasized that it could not fabricate a strategic decision for defense counsel when it appeared on the face of the record that counsel did not and could not have made a strategic decision. In the instant case, by contrast, the record shows that trial counsel's failure to ask for a lesser-included-offense instruction was consistent with an overall strategy of showing that Shanklin acted in self-defense or in defense of a third party, Willis.

The record evidence supporting a lesser offense instruction consisted of a small part of Shanklin's testimony. Shanklin stated that he fired the gun in an effort to scatter people, to calm things down and give Willis an opportunity to get away from his attackers. (Reporter's Record, Vol. IV, p. 22). But there was significant eyewitness and physical evidence that Shanklin intentionally shot Gaddis. Troy Parker, an eyewitness, testified that he saw Shanklin shoot Gaddis from a distance of one to two feet. (Reporter's Record, Vol. III, p. 45). Gabino Garcia, another eyewitness who worked as a security guard at the pool hall, testified that he watched as Shanklin got a brown paper bag from a car, took out a gun, and started shooting. (Reporter's Record, Vol. III, p. 97). Garcia testified that Shanklin was not pointing his gun in the air but directly at individuals. (*Id.* at 98). Other witnesses testified that there were at least five or six uniformed police officers and two to three additional security guards at the pool hall parking lot when the incident occurred. These officers and guards were available if Shanklin needed to secure help for Willis in fending off potential attackers. The witnesses testified that they saw Shanklin running after he fired the gun. He did not immediately comply with police orders to stop and drop his weapon but instead passed the weapon to his friend, Willis. John Shanklin testified that shortly after the shooting and while at the police station, his brother said that he had shot Gaddis in self-defense. Officer Moreno testified that Shanklin told him that he was defending Willis. The physical evidence showed that Gaddis was shot twice at close range. One bullet entered his head traveling slightly upward, and one bullet entered his abdomen traveling slightly downward, which, as the state court pointed out in its opinion, was more consistent with Shanklin intentionally shooting Gaddis than with shooting blindly toward or above a crowd.

The record shows that the defense presented a clear theory from the start that would have been inconsistent with a lesser included offense instruction.  Starting with his opening argument, defense counsel argued that Willis was surrounded by three men and was being beaten when Shanklin fired his weapon.  Shanklin knew that Willis could not defend himself because of his disabilities.  Defense counsel argued that Shanklin shot to protect his friend.  (Reporter's Record, Vol. III, p. 14).  In questioning the State's witnesses, defense counsel made the points that the parking lot was chaotic when the shooting occurred; Gaddis was acting aggressively; Gaddis refused to follow his friends' request to leave; Gaddis pursued John Shanklin in the club and in the parking lot; and Gaddis was one of the men surrounding and beating Willis.  In questioning defense witnesses, defense counsel emphasized that Shanklin and Willis had been lifelong friends and that Willis was unable to speak or defend himself.  Counsel tried to show that Shanklin, his brother, and Willis were all worried about their ability to get out of the parking lot safely, given the aggressive behavior of Gaddis's group, the volatility of the situation, and the fact that someone threw a beer bottle at Shanklin.  Defense counsel consistently tried to show that Shanklin acted in self-defense and in defense of Willis.

Defense counsel pursued this theme in closing argument.  Counsel argued that a person can use deadly force to protect himself or a third party against the apparent use of deadly force.  (Reporter's Record, Vol. IV, p. 174).  Counsel argued that Shanklin knew that Willis was weak and incapable of defending himself and was surrounded by three men who were punching him.  (*Id.* at 75, 175).  Counsel urged the jury to consider the facts from Shanklin's perspective.  (*Id.* at 78).  Counsel argued that Shanklin was acting to protect Willis when, in the midst of the fight and right after the bottle was thrown, he fired two shots.  (*Id.* at 79, 81).  Counsel reminded the jury of Willis's

testimony that he would have used deadly force if he could have. (*Id.* at 82). Counsel argued that Shanklin had to make a split-second decision when confronted with the fact that three men were beating up Willis. (*Id.* at 83).

In *Biagas*, the record supported defense counsel's contention that his failure to challenge a biased juror during the voir dire examination was a mistake of omission rather than a calculated choice. The court "recognized the distinction between strategic judgment calls and plain omissions," and that it was "'not required to condone unreasonable decisions parading under the umbrella of strategy, or to fabricate tactical decisions on behalf of counsel when it appears on the face of the record that counsel made no strategic decision at all.'" *Biagas v. Valentine*, 265 Fed. Appx. at 171-72, quoting *Moore v. Johnson*, 194 F.3d 586, 604 (5th Cir. 1999). The record in the present case does show that defense counsel made a reasoned strategic decision to present a theory of the defense that was inconsistent with manslaughter. The record contradicts Richardson's contention that his failure to request a jury instruction on the lesser included offense of manslaughter was not the result of any reasoned trial strategy. Counsel consistently presented a defense theory of self-defense or defense of a third party. Counsel made a strategic decision to have Shanklin admit to the shooting and justify it by his fear for his own safety and that of his friend. This type of strategic decision is left to the discretion of the trial attorney. *See Geiger v. Cain*, 540 F.3d 303, 309 (5th Cir. 2008). Such discretion is not reviewed with the benefit of hindsight. The question is whether counsel's strategic choices were professionally reasonable at the time, with the information available. *See Martinez v. Quarterman*, 481 F.3d 249, 253 (5th Cir. 2007). The record shows that it was professionally reasonable for defense counsel to make the strategic choice not to request a jury instruction on the lesser included offense of manslaughter. The state court's finding that this was

not ineffective assistance of counsel is not an unreasonable finding of facts or an unreasonable application of the law to the facts. Shanklin cannot overcome the deference this court owes to the state court's conclusions under the AEDPA.

Shanklin argues that this court must review the prejudice prong of his ineffective assistance claim de novo, rather than under AEDPA deference. (Docket Entry No. 1, Petition for a Writ of Habeas Corpus, p. 21). Shanklin relies on *Rompilla v. Beard*, 545 U.S. 374, 390 (2005). The issue in *Rompilla* was whether trial counsel's failure to examine the defendant's prior conviction file made the representation constitutionally ineffective. *Id.* at 383. The Court first held that the state court was unreasonable in deciding that trial counsel's performance was adequate. *Id.* at 383-90. Because the state courts found the representation adequate, they never reached the issue of prejudice. Accordingly, the Court stated that it had to "examine [that] element of the *Strickland* claim de novo." *Id.* at 390 (citing *Wiggins*, 539 U.S. at 534).

"[T]here is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Strickland v. Washington*, 466 U.S. at 697. Because this court found no deficient performance, there is no need to examine the prejudice prong. But even examining the prejudice prong under a *de novo* standard does not lead to a different result. The record provides no basis to find that the jury's verdict would have been different had trial counsel requested an instruction on the lesser included offense of manslaughter. The jury was presented with the testimony of two eyewitnesses that Shanklin pointed the gun toward Gaddis and fired two shots. The State also presented the medical testimony of Dr. Wolf that was consistent with intentional shooting and not random shooting. The State also presented evidence about what Shanklin told people right after the shooting. The jury heard

substantial evidence that Shanklin murdered Gaddis. The evidence that Shanklin committed manslaughter was but a small part of his own testimony. The record does not present a basis to find a reasonable probability that, had the instruction been given, the jury would have found Shanklin guilty of the lesser included offense. *See United States v. Bailey*, 111 F.3d 1229, 1238 (5th Cir.), *cert. denied*, 522 U.S. 927 (1997)(a defendant is not entitled to an instruction on lesser-included offense unless the evidence is sufficient to allow the jury to find him guilty of that lesser offense and acquit him of the greater). There is not a " reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

Shanklin has not proven either prong of the *Strickland* test or the unreasonableness of the state court judgment. He is not entitled to federal habeas corpus relief.

## VI.   Conclusion

The respondent's Motion for Summary Judgment, (Docket Entry No. 12), is granted. Shanklin's petition for a writ of habeas corpus is denied. This case is dismissed. Any remaining pending motions are denied as moot.

Under the AEDPA, a petitioner must obtain a COA before appealing the district court's denial of habeas relief. 28 U.S.C. § 2253(c)(2). "This is a jurisdictional prerequisite because the COA statute mandates that '[u]nless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals ....'" *Miller-El v. Cockrell*, 537 U.S. 322 (2003)(citing 28 U.S.C. § 2253(c)(1)). "The COA statute establishes procedural rules and requires a threshold inquiry into whether the circuit court may entertain an appeal." *Id.* (citing *Slack v. McDaniel*, 529 U.S. 473, 482 (2000); *Hohn v. United States*, 524 U.S. 236, 248 (1998)).

A COA will be granted only if the petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).   A district court may deny a certificate of appealability on its own without requiring further briefing or argument. *Alexander v. Johnson,* 211 F.3d 895, 898 (5th Cir. 2000). To make such a showing, a petitioner "must demonstrate that the issues are debatable among jurists of reason; that a court could resolve the issues [in a different manner]; or that the questions are adequate to deserve encouragement to proceed further." *Barefoot v. Estelle,* 463 U.S. 880, 893 n.4 (1983) (citation and internal quotation marks omitted).   The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong. *Id.* at 1040 (citing *Slack v. McDaniel,* 529 U.S. 473, 484). Shanklin has not made "a substantial showing of the denial of a constitutional right."   A certificate of appealability is not issued.

SIGNED on September 21, 2009, at Houston, Texas.

_____
Lee H. Rosenthal
United States District Judge